THE STATE OF DELAWARE,

*vs.*

POTTER GRIFFITH, ET AL.

*Kent, March Term*, 1847.*

Charitable uses are not within the rule of law against perpetuities.

A devise of real estate,with a direction that the same be not sold but rented—
   " the proceeds arising from such rents" to be applied to certain charitable uses—*held*, not to be within the law against perpetuities.

---

* This case was not found among Chancellor Johns' papers in time to publish it in its proper order.

Prior to the English Statute of 9 GEO. II, charitable uses in England were subject to no restriction.

The English mortmain acts did not extend to the British colonies.

The Delaware Statute of 17 GEO. II, for the relief of religious societies, &c., considered; its history and objects. The prohibitions in this statute against testamentary gifts of real estate to religious societies do not affect charitable uses generally.

A devise to certain charitable uses of a fund, to be distributed "by agents, to be appointed by the Orphans' Court or the Levy Court of Kent County, as may be deemed most proper," is not void, for uncertainty as to which one of the two Courts shall appoint the agents. Either Court may exercise the power of appointment. If both refuse, this Court will appoint. So, were the power of appointment void for uncertainty, this Court would have power to create the necessary agency.

Distinction between limitations of the legal estate and limitations by way of trust, with respect to the degree of certainty requisite in the objects to take.

A devise of lands in trust "to and for the support, maintenance and education of the poor white citizens of Kent County generally," coupled with a direction that no part of the bequest should "be applied to the use or benefit of any person or persons residing within the walls of the Poor House, but to be distributed amongst such only of the poor who by timely assistance may be kept from being carried to the Poor House and becoming subjects thereof," is not void for uncertainty in the description of the objects.

Uncertainty as to the individual beneficiaries, until appointment or selection, is characteristic of á charitable use.

An equitable interest vests in the beneficiaries of a charitable use, from the time of their appointment or selection—such as entitles them to enforce their equitable rights.

The jurisdiction of the Court of Chancery in this State to protect and enforce charitable uses, considered at large and sustained.

Such jurisdiction, in England, existed in the Court of Chancery prior to the Statute of 43 Elizabeth, and is not founded on that statute.

The cases of *Baptist Association vs. Hart's Ex'rs.* 4 *Wheat S. C. R.* 1, and *Vidal et al. vs. Girard's Ex'rs.*, 2 *How. S. C. Rep.* 127, reviewed.

50

CASE STATED IN EQUITY.—This was an information filed by the Attorney General to establish the trusts of a devise to charitable uses made by the last will and testament of Benjamin Potter, dec'd. The questions arising in the case were submitted to the Chancellor upon a case stated, the material facts of which were as follow:—

Benjamin Potter, being seized of a large estate, real and personal, made his last will and testament, bearing date July 26th, 1839, and also three codicils; No. 1, dated July 26th, 1839, No. 2, dated September 5th, 1843, and No. 3, dated October 12th, 1843. The testator died October 21st, 1843, and probate was duly made of his will and codicils.

By the will and codicils of the testator, taken all together, he devised all the residue of his estate, which included a large real estate situated in Kent County, to Potter Griffith, George S. Adkins and Levin H. Adams, (who were also appointed executors,) in trust, "to be by them, my said executors, rented out and the proceeds arising from such rents to be applied to and for the support, maintenance and education of the poor white citizens of Kent County generally"—the distribution thereof to be made " by agents to be appointed by the Orphans' Court or the Levy Court of Kent County; as may be deemed most proper. I wish it to be clearly understood that no part of my bequest shall be applied to the use or benefit of any person or persons residing within the walls of the Poor House; but to be distributed amongst such only of the poor who by timely assistance may be kept from being carried to the Poor House and becoming subjects thereof." *

---

*The items of the will and codicils, out of which the questions arose, are as follow:

*Item* 18 *of the Will.*—" I give and bequeath to Potter Griffith, George S. Adkins and Levin H. Adams, all the balance or residue of my estate, real, personal and mixed, of every description, in trust; also all the real

Statement of the case.

The trustees named in the will declined to accept the trust. The defendants, who were the heirs at law of the testator, brought an ejectment for the residuary real estate, claiming that the devise of it to the charitable uses was invalid. Pending this action the present case stated was filed, wherein the State was made a complainant and the heirs at law defendants,as upon an information filed by the Attorney General to restrain the ejectment at law and to establish the trusts of the will.

The questions raised by the case stated were, " whether the said devise, so made in and by the said 18th Item of the said last will and testament and said codicils thereto, unto and for the said charitable uses, objects and purposes in manner and form aforesaid, are valid and capable of being sustained and carried out in a court of chancery, according to the rules and principles of equity; or whether the

estate which I may purchase or acquire, after the date of this my last will and testament, and after a proper settlement of my estate and sale of all such of my lands as are not devised in former items of this my will ; which said lands they may sell and dispose of, at such time or times as they may deem most proper ; and all the net proceeds of all my real and personal estate, after paying the legacies given and bequeathed in the former items of my will, to be paid over to my executors, Potter Griffith, George S. Adkins and Levin H. Adams.

I particularly enjoin it on my executors, or the survivors or survivor of them, or agents appointed by them or by the Chancellor of the State of Delaware, to sell,at such times as they may deem most advisable, and to lay out all the net proceeds, as it shall become due, in such stock as they or a majority of them may deem most proper, and to reinvest all such interest or dividends as may arise from said stock, for the full term of five years from the date of the purchase or investment of such stock by my executors ; and my will and desire is that all the net proceeds or dividends arising from said stock shall be distributed by my executors in the following manner, to wit: one-third thereof to the trustees of the Methodist Episcopal Church in the town of Milford, Delaware, for the sole use and benefit of the said Methodist Episcopal Church in said town ; one other third part thereof to and for the support of the aged and infirm portion of the mechanics residing in the town of Milford, and to assist such young mechanics in setting up or commencing their respective trades, who shall not be able to do so themselves, of their own means; such distribution to be

same are void or illegal and not capable of being sustained and carried out in a court of equity, according to the rules and and principles of equity."

It was agreed by the parties " that in case the Court shall be of opinion and decide that said devises, so made in manner and form aforesaid, are valid and capable of being sustained and carried out in a court of chancery, according to the rules and principles of equity, a decree shall be entered in favor of the complainant in this suit, perpetually enjoining the said defendants, who are lessors of the plaintiff in the said action of ejectment, and that the Court may make such decree or decrees as may be deemed necessary for establishing the trusts and charitable uses of the will and carrying the same into execution. And, further, it was agreed that in case the Court shall be of the opinion and decide that said devises, so made in manner

---

made by trustees, to be appointed by a majority of the mechanics at that time living in the town of Milford and their successors, and to be distributed by said trustees at such times and in such sums as they, or a majority of them, may deem most proper. The remaining one-third part thereof to be distributed amongst the poor white citizens of the town of Milford and of Milford Hundred who are not otherwise provided for in any of the ·preceding items of my will; and this distribution is to be made by agents to be appointed by the Orphans' Court or the Levy Court of Kent County, as may be deemed most proper. I wish it to be clearly understood that no part of my bequest shall be applied to the use or benefit of any person or persons residing within the walls of the Poor House, but to be distributed amongst such only of the poor who, by timely assistance, may be kept from being carried to the Poor House and becoming subjects thereof."

In *Codicil No.* 2, was a provision as follows :—

*Fourthly*—In item 18th, of my last will and testament aforesaid, I wish to make and do hereby make the following alteration, to wit : I wish and desire that all my real estate, of which I may be possessed at the time of my decease, and which has not been devised or given to individuals in my last will and testament aforesaid, instead of being sold by my executors, as provided in said eighteenth item, shall be by them my said executors rented out, and the proceeds arising from such rents to be applied by my said executors to the same purposes and for the same uses as is mentioned in the three items and under the three heads of distribution, as written in the

and form as aforesaid, are not valid, nor capable of being sustained and carried out in a court of chancery, according to the rules and principles of equity, the Chancellor shall decree accordingly.

But, it was further agreed that any of the said parties might appeal from any decree which should be made by the Chancellor in this cause to the Court of Errors and Appeals, and that such appeal or appeals should be heard and decided in the Court of Errors and Appeals upon the case stated.

The cause came before the Chancellor, at the March Term 1847, and was submitted upon the case stated with statements by counsel of points and authorities.

*E. W. Gilpin, Attorney General,* with whom was *J. P. Comegys,* for the State.

said eighteenth item, and on the fourth page of my last will and testament aforesaid; it being my intention and meaning hereby to alter and amend said eighteenth item only so far as to enjoin upon my executors aforesaid the renting instead and in the place of the sale of my real estate.''

In *Codicil No.* 3, was a provision as follows :—

" *Sixth.*—I hereby cancel, annul and make void all and every part of my last will and testament, and of the codicils thereto, that gives and devises any part or portion of my estate to the trustees of the Methodist Episcopal Church in Milford ; and also all and every part thereof that gives and devises any part or portion of my estate to and for the support, use and benefit of the mechanics residing in the town of Milford ; and, in the place and stead of such distribution to the Church aforesaid and amongst the mechanics aforesaid, I give and bequeath that portion of my estate that was devised for those two purposes, and also that portion of my estate that was devised to the " poor white citizens of the town of Milford and of Milford Hundred" (hereby annulling and making void this last mentioned item as it stands in the 18th item of my will also) to and for the support, maintenance and education, of the poor white citizens of Kent County generally—the apportionment and distribution thereof to be made in the same manner and under the same restrictions and regulations as are mentioned and written in the 18th item of my last will and testament, to which this present writing is a codicil, concerning the poor white citizens of the town of Milford and of Milford Hundred.''

*M. W. Bates*, and *D. M. Bates*, for the defendants.

JOHNS, JR., CHANCELLOR.—The question submitted in the case stated respects—*first*, the validity of the devise, and *secondly*, the power of this Court to execute it.

It is admitted to be a devise to charitable uses. The statement of the case does not specifically question the devise as to the quantity or interest of the estate, but regards the invalidity of the devise.

In the points presented the complainant insists that the estate devised in trust is a fee simple in the trustees; and that if the fee did not vest in them, still the whole beneficial interest in the said real estate is devised to charity. The defendants, in their second point, allege that the real estate was devised, as aforesaid, simply to hold and manage the same. I shall, therefore, before considering the general question, advert to this aspect of the case.

The words of the will in the 18th Item, " all the balance or residue of my estate, real, personal and mixed in trust," I have no doubt gave the legal estate in fee. The power to sell was added and the purchase money directed to be invested in order to create a permanent fund, the annual income thereof being appropriated to certain uses. I also consider that the codicil No. 2 revokes the power of sale without disturbing the devise of the legal estate, and annuls the uses declared by the will, substituting, in lieu thereof, a new and distinct object of charitable use, with authority to the trustees to manage the estate and receive the income, to be applied to the charitable use by agents appointed by the Orphans' Court or the Levy Court of Kent County. The testator evidently intended a trust for a charitable use, and has used words which by adjudged cases are sufficient to vest a fee in the trustees. They were persons capable of taking, but have refused the trust. Can their refusal defeat the testator's will or destroy the trust, supposing the

devise and the trust in all other respects valid? The uniform course and action of a court of chancery, which never allows a trust to fail for want of a trustee, negatives the idea. Therefore, it is immaterial whether the legal estate be in the trustees or descends to the heirs: the trust, being created and incident to it,will be enforced by the Court unless it be invalid from some other cause.

I shall now consider the other causes relied on as rendering the devise invalid.

1. The first is that the testator has designed and attempted to create a perpetuity, and to render said real estate for ever inalienable, contrary to and in violation of the plain rules of law on the subject. The case stated admits the devise in trust to be for a charitable use, which is an estate or interest that does not fall within the scope of the reasoning on which the rule against perpetuities rests. In *Lewis on the Law of Perpetuities p.* 663 (*Law Lib.*,) it is said; "when, either from circumstances extrinsic to a limitation or from the character of its subject matter, a sufficient guarantee exists against any violation of the spirit of the law for the prevention of remoteness, their force and applicability, with respect to any such limitation, cease so far as concerns the necessity for expressly conforming it to the period prescribed by law. This consideration seems to apply to the three following classes of limitations : 1. limitations executory or by way of remainder after or in derogation of estates tail ; 2. limitations whose subject matter is of limited endurance; and 3. limitations in mortmain and to charitable uses."

It is apparent that until the Statute of 9 Geo. II, little restraint was imposed on alienations of lands for charitable uses. At that period,as Sir William Blackstone remarks, (2 *Bl. Com.* 263,) it was apprehended that persons on their death beds might make large and improvident dispositions, even for these good purposes,and defeat the political ends

of the statutes of mortmain; and,in the words of Mr. Jarman(1 *Jarman on Wills* 198),"it appears to have been considered, that this disposition would be sufficiently counteracted by preventing persons from aliening more of their lands than they chose to part with in their life time ; the supposition evidently being that men were in little danger of being perniciously generous at the sacrifice of their own personal enjoyment, and when uninfluenced by the near prospect of death."

In England, after the Statute of 9 Geo. II ch. 36, all testamentary charitable provisions out of real estate,or chattels savoring of the realty,were prohibited; and restrictions were imposed on like provisions by instruments *inter vivos.* *Lewis on Perp.* 691; (*Law Lib.*)

The mortmain acts did not extend to the British Colonies ; and Sir William Grant says, in *Atty. Gen'l. vs. Stewart,* 2 *Mer.* 164, that, in its causes, objects, provisions, qualifications and exceptions,it is a law wholly English,calculated for purposes of local policy, complicated with local establishments, and incapable, without great incongruity in its effect,of being transferred,as it stands, into the code of any other country.

It thus appears that, anterior to the Statute of 9 Geo. II, ch. 36, a devise of land to charitable uses was not invalid, and was only rendered so by the provisions of that act ; and further, that the rule of perpetuity was inapplicable.   Regarding, therefore,the law and equity of the case as subject to the common law and principles of equity bearing upon it,in the state of Delaware, unless some legislative act of our own has varied the subject of devises to charitable uses, as has been done in England, the objection to the validity of the devise cannot be sustained on the ground that it creates a perpetuity.

It may be expedient here to notice the only acts of legislation which appear to have any bearing upon this case, especially as one of them,with respect to religious societies,

resembles, in its provisions, the Statute of 9 Geo. II. The acts to which I have reference are to be found in the *Dig. Del. Laws* (1829), 457-9, under the title " Religious Societies." The first is entitled " An act for the enabling of religious societies of protestants within this Government to purchase lands for burying grounds, churches, houses for worship, schools," &c., passed in 17 Geo. II. The peculiar phraseology of the title of this act may be supposed to imply a negation of charitable uses. The provisions of the act are confined to religious protestant societies. It was an act of the Colonial Assembly, intended for the benefit of such religious societies, being protestant, as were not of the Church of England. The latter, being established by law, had a legal existence, and was secure in the enjoyment of its legal rights : the former, although tolerated, it was supposed had not a legal capacity, either to receive or protect any temporal rights. Besides, cases had occurred in which decisions had been made adverse to temporal interests of protestant religious societies not of the established church. *Attorney General vs. Richard Baxter,* 1 *Eq. Ca. Ab.* 96; 1. *Vern.* 248. There is no protection for charitable uses to any religious body not belonging to the established church except under the Toleration Act. *Loyd et al. vs. Spillet,* 3 *P. Wms.* 344, *in* 1734, as to dissenters. *Atty. Genl. vs. Andrews, 1 Ves. Sr. R.* 225, by Lord Hardwicke in 1741, as to Quakers. *The Atty. Genl. vs. Cock,* 2 *Ves. Sr. R.* 273, in 1751, by Sir John Strange, Master of the Rolls, in the case of Baptists. In the *Atty. Genl. vs. Pearson,* 3 *Mer.* 409, Lord Eldon quotes Lord Mansfield's words; " the Toleration Act established dissent. "

For religions not tolerated, there are no valid charitable uses ;—1 *Vent.* 293; *Fitzg.* 64; 2 *Swans,* 539; *Ambl.* 228 ; 2 *Swans,* 470;—none for supporting or teaching the religion of the Jews; but for the maintenance of poor Jews and for their instruction in letters they are good without the aid

of the statute. *Ambl.* 228; 2 *Swans.* 487. The Toleration Act of I William and Mary, ch. 18, did not extend to the colony of Pennsylvania, and consequently not to the counties on the Delaware; nor is there a word in the charter of Charles II securing that right to the Colonists, and only one clause on the subject of religion in the 22d section, and that of rather a contrary character; for it inhibits all annoyance to any preacher or preachers approved by the Bishop of London and sent into the Colony at the request of the inhabitants, to the number of twenty, expressing their desire to the Bishop to that effect. The suspected faith of Charles II, the well known faith of the Duke of York, the friend of William Penn, and the prevalent though most unfounded doubts of Penn's own sincerity would have made a clause of general toleration in the charter a theme of outcry against popery in disguise. Whatever may have been the cause of this omission in the charter, it was clear that so far as it professed toleration it was only toleration for the Church of England, as by law established; and this jealousy of dissent on the one hand, and a like jealousy of the established church on the other manifesting itself variously, but among other forms in the two great points of affirmations and the estates of religious societies of protestant dissenters, without any the least intermixture of the question of charitable uses generally, were the cause of a contest between the crown and Colony through the whole reign of Queen Anne to the end of George I; and, though it was mitigated at the close of his reign, and still further in the reign of George II, yet so much of it as regarded charitable uses for the propagation of religion was extinguished, with the principle on which they were resisted, only by the Revolution of 1776. The Uniformity Act of Charles II before the charter, the Toleration Act afterward, which did not extend to the Colonies, the 8th sec. of 5 Anne, ch. 8, extending the establishment to England and " the territories thereof," which by some was inter-

preted to embrace the Colonies, the absence of all express toleration in the charter, and the tendencies of Queen Anne's reign to spread the influence of the Church of England, made the position of the property of the other churches in the Colony a subject of great uneasiness; and the more so from the pertinacious refusal of the crown to permit any law in relief of conscientious scruples in regard to oaths. The object of the act of 1731 was to counteract religious intolerance and to place all protestant religious societies on the same footing on which the established church stood in England and also in the Colonies. For a full and lucid historical and legal detail upon this subject, I would refer to the argument of Mr. Binney in the case of *Vidal et al. vs. City of Philadelphia.* The Pennsylvania act was passed at the same time with ours, and is precisely similar.

The extracts from the argument of Mr. Binney in the case referred to have been made to direct attention to them, and because our act and the Pennsylvania act were enacted at the same time and under the same proprietary government; and the historical and legal details I consider have the same application.

The Revolution of 1776 having dissolved the connection of the Colonies, and rendered each State sovereign, the constitution separated Church and State. This new state of things placed all religious societies upon the same platform—the 29th Article declaring, "there shall be no establishment of any one religious sect, in this State in preference to another." (See Constitution or system of Government, Sept. 20th, 1776. See also the Constitution of the State of Delaware, 1792.) No preference was to be " given by law to any religious societies, denominations or modes of worship." Art. 1, Sec. 1. Again, it was provided that " the rights, privileges, immunities and estates of religious societies and corporate bodies should remain as if the Constitution of the State had not been altered." Art. VIII, Sec. 9. Previous to the Constitution of 1792,

in the year 1787, under that of 1776, an Act of Assembly made provision prescribing the mode whereby all religious societies, in compliance therewith, might become incorporated and appoint trustees; also authorizing such corporations to acquire and hold real and personal estate. To guard against the undue accummulation of real estate the title thereto could only to a limited amount of annual income be acquired, and that only by deed executed and in the mode specially designated. This Act, like that of 9 George II, so far as religious societies were concerned, prohibited all testamentary provisions out of real estates. The Act cannot be considered as affecting charitable uses generally ; and, with respect to the corporations created' under it, has always been confined to such devises as related to or embraced real estate.

Considering the question presented in the case stated not to be within the Acts referred to, nor within the rule of perpetuity, I shall next proceed to examine the other grounds relied on as invalidating the devise.

2. I have already observed that the refusal of the trustees cannot affect the validity of the devise if there be no other objection. It is said that in this case the testator has marked out or attempted to mark out and establish his own particular plan or medium for ascertaining and designating the individuals under the general and indefinite class of the poor, to which individuals, thus ascertained, his bounty was to be apportioned and distributed, viz ; by agents, to be appointed by the Orphans' Court or Levy Court of Kent County, as may be deemed most proper. It is contended that the said plan or medium is in itself absolutely and materially defective and uncertain and incapable of being carried out, by reason, particularly, of uncertainty as to which one of the said two Courts shall appoint the said agents ; and that, therefore, the devises and dispositions of the residue of said real estate are altogether uncertain and incapable of being reduced to cer-

tainty, and are null and void. This objection is not founded on the uncertainty of the objects of the trust, but simply applies to the mode prescribed by the testator in which the agency for distribution is authorized to be appointed. The testator has defined the class and described the condition of the persons intended to be benefited by the trust. The distribution to the persons answering the description by the agents, when appointed, is imperative. They are not the depositaries of a general discretionary power, but of one so specially limited in its action as to be subject to the control of this Court,if it should be exercised contrary to the will of the testator. The power of appointment given to either of the two Courts named,if it is to be regarded as precluding both,would appear productive of a singular inconsistency. It would be equivalent to saying that because I authorize an act to be done by either of two persons named, therefore, neither shall do it. I apprehend the act to be done ought to be done by one or the other ; and this Court should consider that it will be performed, unless advised to the contrary by the refusal of both. Then it appears to me the mode prescribed by the testator does not necessarily defeat the power of appointment by one or the other of the Courts designated. But suppose both to refuse to exercise the power of appointment, and thereby the agency for distribution should fail to be created, can this Court remedy the deficiency and call into existence an agency for applying the annual income of the trust fund so as to execute the trust ? The case would not be different in principle from many that have been the subject of equity jurisdiction,supposing in all other respects the power of the Court embraces it. To explain and illustrate the position and apply the principle, I shall advert to the rule of equity as settled by decisions. This Court will not permit the general intention to fail for want of circumstances annexed, which by the fault or neglect of the parties cannot take effect. 2 *Ves. Jr.* 390.

There are many cases where the most general gifts for charity have been executed. The circumstance that the trustee is unable by death to dispose of it makes no difference, because it is a power given to a person. Suppose there was no gift but only a power to the executor to dispose to such and such charities; there the charities survive. But here it is much stronger, because the testator has recommended a more particular charity than the general one. It is then impossible to say the charity must not be sustained. 1 *Ves. Jr.* 475. In the case under consideration the particular charity is accurately defined by the testator, the trust created, and the qualifications or condition of the objects to be the recipients of the benefit described. The agents to distribute, when appointed, must do it in the mode directed by the testator: hence, it is apparent the appointment and the agents appointed are but instrumental in giving effect to the general intention, which is charity. Suppose, then, the Courts neglect or refuse to appoint the agents, would it vary the case from that in *Att'y General vs. Boultbee*, 2 *Ves. Jr.* 380, where 'the persons having the authority' neglected or refused to appoint? or that in which the testator devised to such charitable uses as he should appoint and no such appointment could be found? 1 *Vern.* 234; 7 *Ves. Jr.* 43, *n.*; or to such charitable uses as he should appoint, and he died without making an appointment? *Freem. Ch. Cas.* 261; *Mills vs. Farmer*, 1 *Mer.* 55. In these cases, it should be observed, the object of the charity and the person to designate it were both wanting; but, in the present case, the only defect relied on is the want of an agent to execute the distribution of the fund in the mode and to the objects the testator has himself directed in a particular manner. It may be said the objection does not rest on the ground I have stated, but rather on the fact that the appointment being vested in either the Orphans' Court or Levy Court, as may be most expedient, has negatived the possibility of either

making the appointment. If this be so, and neither can appoint, then the case presented is one of no agency to distribute; and, from the authorities above referred to, I entertain no doubt this Court has the power, and would execute the trust. But, the right of appointment being given to either, I consider either may exercise it, and the agency would be legitimately constituted.

3. The third and last objection to the validity of the devise is, that the said devise of the residue of the testator's real estate is void for uncertainty, there being no *cestuis que trust* or beneficiaries designated in the will, nor ascertainable under its provisions, for whom an interest can be asserted in a court of equity.

This objection assigns as the ground of the uncertainty of the devise; *first,* that the will has not designated the beneficiaries, and *also* that under its provisions they are not ascertainable.

The limitation of an estate to the poor of a parish would, at law, be void (*Coke on Litt.* 3 *a*)because the rules of pleading require the claimants to bring themselves under the gift, and no indefinite multitude, without public allowance, can take by a general name; but, by way of trust, they are capable of taking; for they assert no title in themselves,but call upon the trustees to observe the dictates of good conscience. (*Gilbert on Uses,* 44). But who shall answer the description of poor of a parish—whether those who receive or those who do not receive parish relief—appears to have been considered a matter of doubt. Sir J. Leach, in the case of *Atty Gen'l vs. the Corporation of Exeter,* 2 *Russ.R.* 47, and Lord Lyndhurst, in the same case, 3 *Russ.R.* 395, determined that the objects of such a trust were the poor who did not receive parish relief; for, otherwise, it was said, the rich, by the diminution of the rates, would participate in the charity. But Lord Eldon thought that the fund should be administered without reference to parochial relief; for assistance might be given to a pauper without

exonerating the rich from their usual contribution to the rates. To the relief which the law had provided, further relief might be added, which the parish was not bound to afford. *S. C.* 2 *Russ. R.* 51, 54. Besides, the appropriation of the fund to the poor not in receipt of parish relief might still have the effect of conferring a benefit on the rich ; for persons who could not otherwise have maintained themselves, might, by means of the charity, be prevented from seeking assistance from the rate. See *S. C.* 3 *Russ.R.* 397.

The charitable uses declared in the testator's will and codicils are, " to and for the support, maintenance and education of the poor white citizens of Kent county generally, to. be apportioned and distributed by agents to be appointed by the Orphans' Court or the Levy Court of Kent County, as may be deemed most proper ; no part of the bequest to be applied to the use or benefit of any person or persons residing within the walls of the Poor House, but to be distributed amongst such only of the poor who by timely assistance may be kept from being carried to the Poor House and becoming subjects thereof."

It is apparent from the particular manner in which the testator has limited the application of his bounty that he intended it should be confined to such poor of the county as by timely aid would be kept out of the Poor House. With respect to the class of poor to be benefited, it is, therefore, neither vague nor indefinite. A bequest to the poor is one degree less general than charity at large, which may affect the administration but not the gift itself. A gift to the poor of a particular county is still less general than a bequest to the poor. But, in the present case, the devise being to the poor white citizens of Kent County generally, excepting such as are in the Poor House, and to be distributed amongst such only of the poor who by timely aid may be kept out, seems to approximate as near precision as the subject is capable of, considered as a classification of the objects of his bounty when creating a charitable

use. Had he been more definite, and individualized the particular persons, the peculiar characteristic of a charitable use would have been merged in the existence of private right, and "made it that selfish thing that private property is, to require for it some characteristic that will give it the cast of personal possession and a lawful title, by which one man may say to another, even of the same bereaved family, 'it is mine and not yours.' The objection demands for charities that certainty and definiteness which are the badges of private right, but of charity its bane. Uncertainty in the sense of the law of charities is its daily bread. The greatest of all solecisms in law, morals, or religion, is the supposition of a charity to individuals personally known and selected by the giver. There is not, there never was, and there never can be, such a thing as charity to the known except as unknown." Uncertainty of person until appointment or selection is, in the case of a charitable trust for distribution, a never failing attendant. Hence, I consider the devise is not void because the beneficiaries are not individually designated in the will.

But it is further objected that, under its provisions, they are not ascertainable for whom an interest can be asserted in a court of equity. This part of the objection appears to imply a defect in the will of the testator in not conferring such a vested equitable interest in the objects of the class as would entitle them to enforce their equitable rights; or, in other words, that because no interest vests until appointment that, therefore, none exists. "Nothing can be more erroneous than the supposition that the equitable interest of the beneficiaries of a charitable use does not vest. It vests precisely in the same manner as a use under a private power of appointment. What the duration of the vested interest of the beneficiary shall be depends entirely upon the pleasure of the founder. It may be for life, for years, during good behavior, or at the will of the trustees; but in all instances, though it be an estate

52

or interest at will, it is from the time of appointment a vested interest." 3 *P. Wms. R.* 146; 3 *Atk.* 164; *Shelf. on Mort.* 169, 36 *Law Lib.*; 3 *Mer.* 402: 10 *Barn. and Cress,* 721; *Shelf. on Mort.* 765, *note* 9.

I shall now proceed to the consideration of the remaining question, viz. whether the devise is capable of being sustained and carried out in a court of chancery, according to the rules and principles of equity. This appears not to question the inherent jurisdiction of the court but its application in executing the purpose contemplated by the testator. Yet, as the objection may have been intended to question the jurisdiction of the Court in regard to its equity powers, as distinguished from its other powers, it may be proper to advert to the rule established upon the subject.

The principal—originally, almost the whole—jurisdiction of a court of equity was the administration of trusts, by protecting not only the visible owner, who alone can proceed at law, but the individual equitably, though not legally, entitled. From that principle arose the practice of administering the trusts of a public charity. It was established by three early cases, that where property was not vested in trustees, and the gift was to charity generally, not to be ascertained by the act of individuals referred to, the charity was to be disposed of on a bill to be preferred in the Attorney General's name; not by a scheme before the Master, but by the King, the disposer of such charities, in his character of *parens patriæ.* 1 *Vernon* 224; 2 *Lev.* 167; *Freem.* 330. *In Moggridge vs. Thackwell,* 7 *Ves. Jr.* 83., Lord Eldon observed, "it being established that where money is given to charity generally and indefinitely, without trustees or objects selected, the King, as *parens patriæ,* is the constitutional trustee, he considered it difficult to raise a solid distinction between an original gift absolutely indefinite and without qualification and a case in which by

matter *ex post facto* the gift stands before the Court, in consequence of that accident, as if it had been originally given indefinitely, without any means for carrying it into execution prescribed." The result however of an elaborate examination of all the authorities made by that learned judge was,that the general principle, thought most reconcilable to the cases,is that "where there is a general indefinite purpose of charity, not fixing itself upon any object, the disposition is in the King by sign manual ; but where the execution is to be by a trustee, with general or some objects pointed out, there the Court will take the administration of the trust." And his Lordship said, in a subsequent case, that the distinction which he adopted in the last cited case was that where the bequest is to trustees for charitable purposes the disposition must be the subject of the scheme before the master ; but where the object is charity,without a trust interposed,it must be by sign manual. 14 *Ves. Jr.* 372. See also 5 *Russ. R.* 112. General charity, if there are no trustees, is administered in one way ; if there are trustees it is administered in another way ; but nothing that is vague and indefinite can be administered at all. 2 *Turn. and Russ. R.* 265, note ; 1 *Sim. and Stu. R.* 69.

By the general principles and the constitution of a court of equity a valid trust is entitled to protection whatever may be the defects of the legal estate. Generally, where a trust is valid, it is a fundamental maxim and principle of equity, and from what now appears it has been so from time immemorial, that the trust shall be protected and enforced by a court of equity. This is without any exception true of all lawful trusts. The universal rule in equity is that a trust shall not fail for want of a trustee; and if one is wanting the Court will execute the office ; and this for an unanswerable reason, that in equity the trust is the estate. In a court of equity it is sufficient that the trust appears; and, if the party creating the trust has not appointed his own trustee, a court of equity will follow the

legal estate and decree the person in whom it is vested to execute the trust—it being a rule which admits of no exception that a court of .equity never wants a trustee. *Coke on Litt.* 290. *b. note* 1, *sec.* 4, *by Butler.* The general rule is,that a trust shall never fail of execution for want of a trustee, and that if one is wanting the Court shall execute the office. *Coke on Litt.* 113. *a, note* 2, *by Hargrave.*

The expression that the trust is tied to the land was used as early as *Gwilliams vs. Rowell, Hardres* 204, in 1661. The principle was never applied for the benefit of particular persons only or of particular trusts. Trusts are executed in equity for all persons indiscriminately. Neither the negligence of the donee, nor accident, nor any other circumstance is permitted to disappoint the trust. *Brown vs. Higgs,* 8 *Ves. Jr.* 574 *; Pitt vs. Pellham,* 1 *Ch. Cas.* 176, in which Lord Keeper Bridgman ruled the contrary, because the implied power of the executor to sell for distribution among legatees never could arise and was void at law, as it was to be executed after the death of the donee; but this decision was reversed by the House of Lords, and the heir was decreed to. convey. 1 *Sug. on Powers* 135 *; 2 ib.* 174. In the *Atty. Genl. vs. Downing,* Lord Chief Justice Wilmot reiterates the principle : "I take it," he says, "to be a first and fundamental principle in equity that the trust follows the legal estate where ever it goes, unless it comes into the hands of a purchaser for valuable consideration without notice." *Wilmot's notes,* 21. Trust estates do not depend on the legal estate for an existence. A court of equity considers devises of trusts as distinct, substantive devises, standing on their own basis, independent of the legal estate or of one another; and the legal estate is nothing but the shadow which always follows the trust estate in the eye of a court of equity, *p.* 22. The individuals named as trustees are only the nominal instruments to execute that intention ; and if they fail, either by death or being under a disability to act or refusing to act, the constitution has provided a trustee, *p.* 24.

*The Atty. Gen'l. vs. Hickman,* 2 *Eq. Cas.Ab.* 193, was the case of a charity,where the trustee died before testator,and the legal estate created by the will failed altogether.    Lord King, nevertheless, established the trust. *Eales vs. England, Prec. in Ch.* 202, ruled by Sir John Trevor, is to the same point. See 1. *Bro. Ch. Rep* 81, *Jonley vs. Clock-makers' Co.; and* 1 *Ves. Jr.* 475.   It is known universally that a trust legacy cannot lapse because the trustee dies,but it survives for the benefit of the *cestui que trust.*

It is a settled principle in equity that a trust shall never fail for want of a trustee. 2 *Story's Eq. Jur. sec.* 1059. This principle of equity does not appear to have been derived from the Statute of 43 Elizabeth or any other statute. It is not a principle derived from the law of charitable uses, but they have taken the benefit of this principle as it exists in the great code of equity.    Sir John Leach says; "the jurisdiction of courts of equity with respect to charitable bequests is derived from their authority to carry into execution the trusts of any will, or other instrument, according to the intention expressed. *Atty. Gen'l. vs. Ironmongers' Company,* 2 *Mylne & Keen* 581 ; *Shelf. on Mort.* 630.

But, admitting the existence of the principle, it is supposed that courts of equity in England originally exercised the power of protecting charitable uses only by or under the Statute of 43 Elizabeth ; and that where the Statute does not extend or has not been adopted they have no such power; or that charitable trusts are excepted out of the general jurisdiction of chancery over trusts.

This is no doubt the material ground relied on by the defendants in this case, inasmuch as the Statute of Elizabeth has not been in form adopted in this State—there never having occured any proceedings under its provisions or conformable thereto.

This is a question of judicial history—a question of fact. If, therefore, it be ascertained that Chancery exercised original jurisdiction over charitable uses anterior to the

Statute of 43 Elizabeth it must establish the position that it was not derived therefrom. The *dictum* of Lord Lough-borough, in *The Atty. Gen'l vs. Bowyer*, 3 *Ves. Jr.* 726 first questions this jurisdiction. He says; " it does not appear that this Court, at that time (namely before the Statute of 43 Elizabeth) had cognizance, upon information, for the establishment of charities. Prior to the time of Lord Elles-mere, as far as tradition in times immediately following goes, there were no such informations as this upon which I am now sitting; but they made out the case, as well as they could, at law." This was evidently the impression of Chief Justice Marshall, and was so applied in *The Baptist Association vs. Hart's Ex'rs.* 4 *Wheat. R.* 1. Until the decision in *The Baptist Association case,* in 1819, no adverse decision had been pronounced against these charitable uses. In one or two instances they had received confirmation, in Pennsylvania, from judicial proceedings. Two cases had occured in the Supreme Court of Massachusetts, and had been sustained by an elaborate judgment of that learned Court. *Bartlet vs. King's Ex'r.* 12 *Mass.R.* 537, in the year 1815 ; *Trustees of Philips Academy vs. King, Ex'r.* 12 *Mass. R.* 553, in the same year. Since the year 1819, however, the cases of charitable uses have been brought into judgment in most of the States ; and, although Maryland, in the same year, and in 1822 and 1823, followed out the reasoning in *The Baptist Association case* and went beyond it, as Virginia has since done in 1832, overthrowing them almost from the foundation, yet in ten or more of the States, including Pennsylvania, they have been sustained. Since the decisions in the cases adverted to the question has been again under consideration in the Supreme Court of the United States, and the opinion of the Court as delivered by Mr. Justice Story in the case of *Vidal et al. vs. Girard's Exr's.* 2 *Howard's S. C. Rep.* 127, restricts *The Baptist Association case* to the influence of state legislation and the peculiar circumstances of the donees (the trustees)

as being an unincorporated association which had no legal
capacity to take and hold the donation in succession for
the purposes of the trust, and the beneficiaries also being
uncertain and indefinite. " Both circumstances, there-
fore," he says " concurred—a donation to trustees inca-
pable of taking and beneficiaries uncertain and indefinite.
The Court, upon that occasion, went into an elaborate ex-
amination of the doctrine of the common law on the subject
of charities antecedent to and independent of the Statute
of 43 Elizabeth,ch. 4 ; for that was still the common law of
Virginia. Upon a thorough examination of all the author-
ities and all the lights, (certainly in no small degree
shadowy, obscure and flickering,) the Court came to the
conclusion, that at common law no donation to charity
could be enforced in chancery where both of these circum-
stances or both of these defects occurred. The Court
said, " we find no *dictum* that charities could be established
on such an information (by the Attorney General) where
the conveyance was defective or the donation was so vague-
ly expressed that the donee, if not a charity, would be inca-
pable of taking." The evident import of this decision is
that the devise itself was invalid ; and being so,a Court of
Chancery could not give it validity unless by virtue of the
Statute of 43 Elizabeth, which having been expressly re-
pealed in Virginia negatived the exercise of any such
power. It is manifest the Court did not intend to decide
against the general jurisdiction of chancery over charita-
ble uses. This more fully appears from the character of
the cases referred to by Justice Story in connexion with
the *dictum* of Lord Loughborough, and the case Lord.
Loughborough is by him supposed to have had under his
consideration, being *Porter's case,* 1 *Coke Rep.* 16, in re-
gard to which Justice Story observes :—" it was resolved
by the Court that the use was a good, charitable use, and
that the Statute did not extend to it. So that here we have
a plain case of a charity held good before the Statute of

Elizabeth upon the ground of the common law, there being a good devise originally, although the condition was bro-ken and the use was for charitable purposes in some respects indefinite. Now, if there was a devisee capable to take as trustee, and the charity was good at common law, it seems somewhat difficult to say why, if no legal remedy was adequate to redress it, the Court of Chancery might not enforce the trust, since trusts for other specific purposes were then, at least when there were designated trustees, within the jurisdiction of Chancery. There are, however, *dicta* of eminent judges (some of which were commented upon in the case from 4 *Wheat.* 1.) which do certainly support the doctrine that charitable uses might be enforced in Chancery, upon the general jurisdiction of the Court, independently of the Statute of 43 Elizabeth, and that the jurisdiction had been acted upon, not only subsequent but antecedent to that Statute. Such was the opinion of Sir Joseph Jekyll, in *Eyre vs. Countess of Shaftsbury*, 2 *P. Wms. R.* 102; 2 *Eq. Cas. Ab.* 710 *p* 2, and that of Lord Northington in *Atty. Gen'l. vs. Tancred*, 1 *Eden R.* 10; *S. C. Amb. R.* 351; 1 *Wm. Bl. R.* 90; and that of Lord Chief Justice Wilmot in his elaborate judgment in *Atty. Gen'l. vs. Lady Downing, Wilmot's notes p.* 1–26, given after an examination of all the leading authorities. Lord Eldon, in *Atty. Gen'l. vs. The Skinner's Co.* 2. *Russ. Rep.* 407, intimates, in clear terms, his doubts whether the jurisdiction of chancery over charities arose solely under the Statute of Elizabeth—suggesting that the Statute has perhaps been construed with reference to a supposed antecedent jurisdiction of the Court by which void devises to charitable purposes were sustained. Sir John Leach, in a case of charitable use before the Statute of Elizabeth—*Atty. Gen'l. vs. The master of Brentwood School* 1 *Mylne & Keen* 376—said, 'although at this time no legal devise could be made to a corporation for a charitable use, yet lands so devised were in equity bound by a trust for the charity, which a court of equity would then execute.'

In point of fact, the charity was so decreed in that very case in the twelfth year of Elizabeth.  But what is still more important is the declaration of Lord Redesdale, a great judge in equity, in *Atty. Gen'l. vs. The Mayor of Dublin,* 1 *Bligh. R.* 312, 347 (1827); where he says, ' we are referred to the Statute of Elizabeth with respect to charitable uses, as creating a new law upon the subject of charitable uses.   That Statute only created a new jurisdiction : it created no new law.   It created a new and auxiliary jurisdiction—a jurisdiction created by commission &c.; but the proceedings of that commission were made subject to appeal to the Lord Chancellor, and he might reverse or affirm what they had done, or make such order as he might think fit for reserving the controlling jurisdiction of the Court of Chancery as it existed before the passing of that Statute ; and there can be no doubt that by information by the Attorney General the same thing might be done.' He then adds that ' the right which the Attorney General has to file an information, is a right of prerogative.   The King, as *parens patriæ,* has a right, by his proper officer, to call upon the several courts of justice, according to the nature of their several jurisdictions, to see that right is done to his subjects who are incompetent to act for themselves, as in the case of charities and other cases.'   So that it appears Lord Redesdale maintains the jurisdiction in the broadest terms, as founded in the inherent jurisdiction of chancery independently of the Statute of 43 Elizabeth. In addition to these doctrines and *dicta,* there is the very recent case of *The Incorporated Society vs. Richards,* 1 *Drury and Warren, R.* 258, where Lord Chancellor Sugden, in a very masterly judgment, upon a full survey of all the authorities and where the point was directly before him, held the same doctrine as Lord Redesdale, and expressly decided that there is an inherent jurisdiction in equity in cases of charity, and that charity is one of those objects · for which a court of equity has at all times interfered to

53

make good that which at law was an illegal or informal gift; and that cases of charity in courts of equity in England were valid independently of and previous to the Statute of Elizabeth.

Mr. Justice Baldwin, in the case of *the will of Sarah Zane,* at the April Term of the U. S. Circuit Court in 1833, after a very extensive and learned research into the ancient English authorities and statutes, arrived at the same conclusion; in which the district judge, the late lamented Judge Hopkinson, concurred; and that opinion has a more pointed bearing upon the present case since it included a full review of the Pennsylvania laws and doctrines on the subject of charities."

Justice Story, having thus noticed the question of jurisdiction in connection with all the authorities and all the lights existing anterior to the Girard case, which at the time of the decision made in that of *The Baptist Association,* he says, was certainly in no small degree shadowy, obscure and flickering, proceeds, at page 196, to observe that " very strong additional light has been thrown upon this subject by the recent publications of the commissioners on the public records in England, which contain a very curious and interesting collection of the Chancery records in the reign of Queen Elizabeth and in the earlier reigns. Among these are found many cases in which the Court of Chancery entertained jurisdiction over charities long before the Statute of 43 Elizabeth; and some fifty of these cases, extracted from the printed calendars, have been laid before us. They establish in the most satisfactory and conclusive manner that cases of charities, where there were *trustees appointed for general and indefinite* charities, were familiarly known to and acted upon and enforced in the Court of Chancery. Some of these cases were not only of an uncertain and indefinite nature, but, as far as we can gather from the imperfect statement in the printed records, they were also cases where there were

either no trustees appointed or the trustees were not competent to take.    These records do, therefore, in a remarkable manner, confirm the opinions of Sir Joseph Jekyll, Lord Northington, Lord Chief Justice Wilmot, Lord Redesdale and Lord Chancellor Sugden.    Whatever doubts, therefore, might properly be entertained upon the subject when the case of the trustees of *The Baptist Association vs. Hart's Ex'rs* was before this court (1819) those doubts are entirely removed by the late and more satisfactory sources of information to which we have alluded.    If then this be the true state of the common law on the subject of charities, it would, upon the general principle already suggested, be a part of the common law of Pennsylvania.    It has been fully recognized and enforced in the State courts of Pennsylvania, as far as their remedial process would enable these courts to act;   *Witman vs. Lex.* 17 *Serg. and Rawle.* 88;   and especially *the case of Sarah Zane's will* before Justice Baldwin and Judge Hopkinson in the Circuit Court."

From the preceding remarks of Justice Story in the opinion of the Supreme Court of the United States, as by him delivered in deciding the case of *Vidal et al. vs. Girard's Ex'rs,* it is apparent that the question as to chancery jurisdiction over charities, independent of the Statute of 43 Elizabeth, is concluded and all doubts entirely removed, especially with respect to its existence and exercise in England.    If, then, the jurisdiction appertains to the courts of Pennsylvania, by virtue of the charter provisions which are the same in relation to the three counties on Delaware as granted by William Penn, how much stronger is the ground for its exercise presented in this state, when we advert to the Act of Assembly, 1 *Vol. Del. Laws,* 130, *Sec.* 21, declaring there shall be a court of equity, and the subsequent establishment by the constitution of the Court of Chancery, with full powers and all that had by law been granted.    The first act is plenary, and is to be found in

*Dig. Del. Laws*,102, *Sec.* 21. (1829.) This act established a court of equity to be held by the Justices of the County Courts of Common Pleas; which said justices,or any three of them within the limits of their commissions and authorities, were, by virtue of the act, empowered and authorized " to hear and decree all such matters and causes of equity as shall come before them in said courts, where the proceedings shall be, as heretofore, by bill and answer, with such other pleadings as are necessary in chancery courts and proper in these parts, with power to issue subpœnas and all other process as may be needful, &c., to award commissions, grant injunctions, as there may be occasion, observing, as near as may be, the rules and practice of the High Court of Chancery in Great Britain, with power to make orders and award all manner of process, and do all other things necessary for bringing causes to a hearing, and to enforce obedience to their decrees in equity, which may be by imprisonment of bodies or sequestration of lands, and admit bills of revivor as the case may require."

Under this view of the questions presented by the case stated, I must enter a decree establishing the trusts of Col. Potter's will, and perpetually restraining his heirs at law from their action to recover the devised premises.

Decree affirmed by the Court of Errors and Appeals, at June Term, 1849.—*See Appendix.*